The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Pfeiffer and the briefs and oral arguments on appeal to the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner.
***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a pretrial agreement dated 30 March 1998 as:
 STIPULATIONS
1. On the date of the injury by accident or onset of the occupational disease giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employment relationship existed between plaintiff and defendant on the date of the alleged injury by accident or onset of plaintiffs alleged occupational disease.
3. On the date of the alleged injury by accident or onset of the occupational disease, the employer was self-insured, with The PMA Group acting as its servicing agent. Compensation Claims Services provided third-party administrating services.
4. The date of onset of the alleged occupational disease giving rise to this claim was on or about 14 November 1996.
5. On the date of the alleged injury by accident or the onset of the alleged occupational disease giving rise to this claim, plaintiffs average weekly wage was $349.85. This yields a compensation rate of $233.24.
6. Stipulated into evidence in this case were plaintiffs medical records (both plaintiff and defendant introduced various records: plaintiffs exhibits one, two, two-A, three, four, five, six, seven, and ten; and defendants exhibit one). Also stipulated into evidence in this matter were copies of all Non-Exempt Wake County Schedule A Timesheets known to exist and a demonstrative exhibit entitled "Summary of Employees Hours, which the parties stipulate accurately reflects the information contained on the Schedule A Timesheets. The parties also stipulated into evidence a copy of plaintiffs resume and a copy of Michael J. Andersons letter of 15 May 1998.
7. Introduced and admitted into evidence in this case were plaintiffs exhibit one through twelve, most of which consisted of a plaintiffs medical records (see paragraph six above). In addition, plaintiffs exhibits consisted of correspondence between plaintiffs attorney and Dr. Moriarty (exhibit one), a monetary determination/reduction data (exhibit eight), plaintiffs recorded statement (exhibit nine), a list of jobs applied for by plaintiff (exhibit eleven), and a Form 22 wage chart (exhibit twelve).
8. Introduced by defendant and admitted into evidence were plaintiffs medical records (see paragraph six above), plaintiffs job description, and plaintiffs complete Employment Security Commission file (plaintiff objects to the admittance of this file). After motion by defendant, the Full Commission did not admit a WH-380 dated 17 December 1996. Defendant objects to this evidentiary ruling.
9. The issues to be determined as a result of the hearing before the Deputy Commissioner were whether plaintiff sustained a compensable injury by accident or contracted a compensable occupational disease and if so, to what indemnity and medical benefits is she entitled. Plaintiffs claim for either injury by accident or occupational disease has been denied by defendant.
***********
Based upon the greater weight of the competent and credible evidence of record in this matter and all reasonable inferences arising therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner in this matter, plaintiff, who is right-hand dominant, was forty-three years old. Plaintiffs educational background includes a four-year degree in business administration obtained from St. Augustines College in 1976, and her work history consists primarily of administrative, secretarial work. On the date of the hearing before the Deputy Commissioner in this matter plaintiff was not employed by defendant or any other employer in any capacity.
2. Defendant hired plaintiff as an administrative assistant the end of May 1996. As an administrative assistant for defendant, plaintiff was assigned to the Human Services division, and her job was to assist Department of Social Services case managers with their caseloads to ensure the timely receipt of benefits by the clients served by Social Services. Plaintiff was required to prepare clients case files so that the case managers could meet with and effectively assist the clients. Specifically, plaintiffs job duties primarily included keying information into a computer to access clients files and information, printing out the information, and making copies. In addition, plaintiff used a computer to key additional information into the clients files, although this task was required less frequently. Plaintiffs job also required her to write information by hand, file, talk on the telephone, and carry files. Plaintiff usually worked an eight-hour day with forty-five minutes for lunch and two fifteen minute breaks.
3. The three main tasks required in plaintiffs job were writing, typing, and copying. Plaintiff spent an average of forty-five minutes to an hour copying each day. However, plaintiff was unable to quantify specifically either the hours spent or even the percentage of time per day that she did each of the tasks other than copying. It is clear that plaintiff used her arms and hands much of the day to perform her job. However, plaintiff engaged in no activities continuously, and plaintiffs job did not require the strenuous use of her arms, hands, or wrists.
4. In the fall of 1996 Hurricane Fran hit Wake County. Because of the hurricanes destruction of property, the workload in Wake County increased as more people required food stamps and Medicaid. Consequently, after the hurricane plaintiff worked four overtime hours the week ending 20 September 1996 and eight overtime hours each of the weeks ending 11 October 1996 and 18 October 1996.
5. In December 1992, prior to her employment with defendant, plaintiff was diagnosed with mild bilateral carpal tunnel syndrome. In addition to this preexisting arm problem, plaintiff has suffered from many other medical conditions for which she sought medical treatment in the years preceding and subsequent to the alleged injury by accident or occupational disease that is the subject of this claim.
6. On 21 October 1996 plaintiff sought treatment with her general health care provider, Kaiser Permanente. Plaintiff was evaluated by a physicians assistant for complaints of neck and right arm pain. The physicians assistant noted that plaintiffs complaints had been present for three weeks, and that there was no history of injury or extra work.
7. Plaintiff continued to treat with the physicians assistant at Kaiser Permanente, and on October 28, 1998 the physicians assistant diagnosed tendinitis in plaintiffs right arm. On November 8, 1996 the physicians assistant referred plaintiff to Dr. Moriarty for evaluation and treatment assistance. At that time Dr. Moriarty was an orthopedic surgeon practicing with Kaiser Permanente.
8. Plaintiff first saw Dr. Moriarty on November 14, 1996, at which time he diagnosed right lateral epicondylitis. Plaintiff remained for some time under the care of Dr. Moriarty and the physicians assistants at Kaiser Permanente, where she was treated conservatively with medication, slings, limitations on activities and use of her right arm, physical therapy, and steroid/Lidocaine injections in her right elbow.
9. On November 8, 1996 plaintiff was given the restriction of wearing a sling on her right arm at all times while she worked. Thereafter, plaintiff was given more explicit work restrictions to be in effect from November 13, 1996 through November 27, 1996, pursuant to which plaintiff was permitted to grasp, grip with the wrist, reach above her shoulder and work at data entry for only four hours a day. However, on November 14, 1996 Dr. Moriarty took plaintiff out of work altogether from that date through November 27, 1996. On December 2, 1996 Dr. Moriarty again restricted the activities listed above to four hours a day, with the provision that if defendant was unable to accommodate these restrictions, plaintiff was to be out of work through February 1, 1997.
10. On January 8, 1997 Dr. Moriarty assigned work restrictions that were to be in place retroactively from December 2, 1996 through February 22, 1997. These restrictions were to supersede all previous restrictions assigned. Dr. Moriarty indicated that plaintiff was not capable of continuous lifting and carrying, grasping, repetitive gripping, and reaching above the shoulder. Plaintiff was also to limit her keyboard activity to thirty minutes each day.
11. Plaintiff worked thirty-two hours the week ending October 25, 1996, twenty-four hours the weeks ending November 1 and 8, 1996, twelve hours the week ending November 15, 1996, and nine and a half hours the week ending December 6, 1996. Plaintiff did not work at all the weeks ending November 22 and 29, 1996. Plaintiffs last day of work with defendant was December 6, 1996.
12. In mid-December 1996 plaintiff attempted to apply for leave under the Family and Medical Leave Act. Plaintiffs physical restrictions in place at that time were the four-hour per day limitations on grasping, gripping with the wrist, reaching above her shoulder, and working at data entry. Defendant could have and did accommodate these restrictions. Because plaintiff did not turn in a Family and Medical Leave Act application or medical documentation certifying that she was totally incapable of working, defendant denied the leave. As of December 9, 1996 plaintiff had exhausted her paid leave benefits. By letter dated December 31, 1996 defendant informed plaintiff that she was terminated effective that day due to her failure to return to work after December 6, 1996.
13. On September 9, 1997 Dr. Moriarty performed a lateral epicondylectomy and tendon release on plaintiffs right arm. On March 24, 1998 Dr. Moriarty assigned a fifteen percent permanent impairment rating to plaintiffs right upper extremity.
14. Dr. Moriarty, while the treating physician in this case, does not specialize in the orthopedic treatment of hands and upper extremities. Dr. Moriarty was unable during the course of his deposition to identify definitively plaintiffs right arm condition. Dr. Moriarty alternately labeled plaintiffs condition as lateral epicondylitis, tendinitis, or tenosynovitis. Dr. Moriarty also equivocated when giving his opinion with respect to the cause of plaintiffs condition. In response to a May 5, 1997 letter from the office of plaintiffs counsel, Dr. Moriarty indicated that it was his opinion that plaintiff was not at more risk "than anyone else doing their work (or "any more so than anyone else) of developing the arm condition. However, by letter dated August 8, 1997 Dr. Moriarty amended this opinion by stating that plaintiffs work placed her "at an increased risk to develop this problems [sic], more so than individuals not performing these activities.
15. Defendant sent plaintiff to orthopedic surgeon Dr. George Edwards, a recognized hand and arm specialist, for an independent medical evaluation on August 8, 1998. The purpose of this independent medical evaluation was to determine whether plaintiffs job caused her condition and to determine the extent of plaintiffs disability therefrom. Prior to the evaluation Dr. Edwards was provided with Dr. Moriartys medical notes relating to his treatment of plaintiff.
16. The testimony and opinions of Dr. Edwards are afforded greater weight than those offered by Dr. Moriarty, even though Dr. Moriarty was the treating physician. Dr. Edwards is a recognized orthopedic surgeon who specializes in the treatment of upper extremities, and he treats patients with epicondylitis and radial tunnel syndrome at least several times a week.
17. Upon his examination of plaintiff and his review of plaintiffs medical notes, Dr. Edwards came to the conclusion that plaintiff suffered from lateral epicondylitis that was severe enough so as to cause pain in her radial tunnel, which is a region where a large tendon crosses the radial nerve slightly below the epicondyle bone in the elbow. Dr. Edwards ruled out a diagnosis of tenosynovitis, as there are no synovium around the tendons in the elbow, and diagnosed right radial tunnel syndrome with mild right carpal tunnel syndrome. Dr. Edwards assigned a four percent permanent partial impairment rating to plaintiffs right arm.
18. According to Dr. Edwards, and based upon the greater weight of the medical evidence, lateral epicondylitis and/or radial tunnel syndrome can be caused by prolonged repetitive or strenuous wrist extension (dorsiflexion). However, Dr. Edwards expressed the opinion that it is very unusual for typing itself to cause radial tunnel syndrome, and that while writing could aggravate carpal tunnel syndrome, it was unlikely to aggravate a condition such as radial tunnel syndrome. Instead, radial tunnel syndrome is more generally caused by a person repeatedly flexing the wrists or lifting heavy objects with the palm facing downwards and then bending the wrist backwards. Lateral epicondylitis and radial tunnel syndrome are quite common, and persons with these conditions can contract them due to work or other activities.
19. Plaintiffs job as an administrative assistant required the near-constant use of her hands and arms. However, plaintiff varied the tasks she did, one day doing more writing than data entry, and the next doing more data entry than writing. Plaintiffs job as an administrative assistant did not require repetitive strenuous bending of her wrists. Lateral epicondylitis and/or radial tunnel syndrome are not conditions characteristic of or peculiar to the job of administrative assistant. There is no evidence to show that any other administrative assistant employed by defendant contracted one or both of these conditions or that the job of an administrative assistant places one at an increased risk of developing these conditions as compared to members of the general public.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The overtime work plaintiff did following Hurricane Fran was not substantial enough to constitute a deviation of her normal work routine. Plaintiffs epicondylitis and/or radial tunnel syndrome did not result from an injury by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat.97-2(6).
2. The tasks required in plaintiffs job were neither strenuous nor repetitive enough to expose plaintiff to a greater risk than the general public of contracting these conditions. Plaintiffs epicondylitis and/or radial tunnel syndrome and any disability relating therefrom are not conditions characteristic of and peculiar to her employment with defendant. N.C. Gen. Stat.97-53(13).
3. Plaintiff, therefore, is entitled to no compensation under the provisions of the North Carolina Workers Compensation Act. N.C. Gen. Stat. 97-2(6); 53(13).
***********
As the result of the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiffs claim must be and is HEREBY DENIED.
2. Each side shall bear its own costs.
This 5th day of May 2000.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/_______________ DIANNE C. SELLERS COMMISSIONER